Chief Justice Roberts
delivered the opinion of the Court.
This “suit has, in course of time, become so complicated, that... no two ... lawyers can talk about it for five minutes, without coming to a total disagreement as to all the premises. Innumerable children have been born into the cause: innumerable young people have married into it;” and, sadly, the original parties “have died out of it.” A “long procession of [judges] has come in and gone out” during that time, and still the suit “drags its weary length before the Court.”
Those words were not written about this case, see C. Dickens, Bleak House, in 1 Works of Charles Dickens 4-5 (1891), but they could have been. This is the second time we have had occasion to weigh in on this long-running dispute between Vickie Lynn Marshall and E. Pierce Marshall over the fortune of J. Howard Marshall II, a man believed to have been one of the richest people in Texas. The Marshalls’ litigation has worked its way through state and federal courts in Louisiana, Texas, and California, and two of those courts— a Texas state probate court and the Bankruptcy Court for the Central District of California — have reached contrary decisions on its merits. The Court of Appeals below held that the Texas state decision controlled, after concluding that the Bankruptcy Court lacked the authority to enter final judgment on a counterclaim that Vickie brought against *469 Pierce in her bankruptcy proceeding.[1] To determine whether the Court of Appeals was correct in that regard, we must resolve two issues: (1) whether the Bankruptcy Court had the statutory authority under 28 U. S. C. § 157(b) to issue a final judgment on Vickie’s counterclaim; and (2) if so, whether conferring that authority on the Bankruptcy Court is constitutional.
Although the history of this litigation is complicated, its resolution ultimately turns on very basic principles. Article III, § 1, of the Constitution commands that “[tjhe judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.” That Article further provides that the judges of those courts shall hold their offices during good behavior, without diminution of salary. Ibid. Those requirements of Article III were not honored here. The Bankruptcy Court in this case exercised the judicial power of the United States by entering final judgment on a common law tort claim, even though the judges of such courts enjoy neither tenure during good behavior nor salary protection. We conclude that, although the Bankruptcy Court had the statutory authority to enter judgment on Vickie’s counterclaim, it lacked the constitutional authority to do so.
I
Because we have already recounted the facts and procedural history of this case in detail, see Marshall v. Marshall, 547 U. S. 293, 300-305 (2006), we do not repeat them in full here. Of current relevance are two claims Vickie filed in an attempt to secure half of J. Howard’s fortune. Known to the public as Anna Nicole Smith, Vickie was J. Howard’s third wife and married him about a year before his death. Id., at *470 300; see In re Marshall, 392 F. 3d 1118, 1122 (CA9 2004). Although J. Howard bestowed on Vickie many monetary and other gifts during their courtship and marriage, he did not include her in his will. 547 U. S., at 300. Before J. Howard passed away, Vickie filed suit in Texas state probate court, asserting that Pierce — J. Howard's younger son — fraudulently induced J. Howard to sign a living trust that did not include her, even though J. Howard meant to give her half his property. Pierce denied any fraudulent activity and defended the validity of J. Howard's trust and, eventually, his will. 392 F. 3d, at 1122-1123,1125.
After J. Howard's death, Vickie filed a petition for bankruptcy in the Central District of California. Pierce filed a complaint in that bankruptcy proceeding, contending that Vickie had defamed him by inducing her lawyers to tell members of the press that he had engaged in fraud to gain control of his father's assets. 547 U. S., at 300-301; In re Marshall, 600 F. 3d 1037,1043-1044 (CA9 2010). The complaint sought a declaration that Pierce's defamation claim was not dis-chargeable in the bankruptcy proceedings. Ibid.) see 11 U. S. C. § 523(a). Pierce subsequently filed a proof of claim for the defamation action, meaning that he sought to recover damages for it from Vickie's bankruptcy estate. See § 501(a). Vickie responded to Pierce’s initial complaint by asserting truth as a defense to the alleged defamation and by filing a counterclaim for tortious interference with the gift she expected from J. Howard. As she had in state court, Vickie alleged that Pierce had wrongfully prevented J. Howard from taking the legal steps necessary to provide her with half his property. 547 U. S., at 301.
On November 5, 1999, the Bankruptcy Court issued an order granting Vickie summary judgment on Pierce’s claim for defamation. On September 27, 2000, after a bench trial, the Bankruptcy Court issued a judgment on Vickie’s counterclaim in her favor. The court later awarded Vickie over $400 million in compensatory damages and $25 million in pu *471 nitive damages. 600 P. 3d, at 1045; see 253 B. R. 550, 561-562 (Bkrtcy. Ct. CD Cal. 2000); 257 B. R. 35, 39-40 (Bkrtcy Ct. CD Cal. 2000).
In post-trial proceedings, Pierce argued that the Bankruptcy Court lacked jurisdiction over Vickie’s counterclaim. In particular, Pierce renewed a claim he had made earlier in the litigation, asserting that the Bankruptcy Court's authority over the counterclaim was limited because Vickie’s counterclaim was not a “core proceeding” under 28 U. S. C. § 157(b)(2)(C). See 257 B. R., at 39. As explained below, bankruptcy courts may hear and enter final judgments in “core proceedings” in a bankruptcy case. In noncore proceedings, the bankruptcy courts instead submit proposed findings of fact and conclusions of law to the district court, for that court’s review and issuance of final judgment. The Bankruptcy Court in this case concluded that Vickie’s counterclaim was “a core proceeding” under § 157(b)(2)(C), and the court therefore had the “power to enter judgment” on the counterclaim under § 157(b)(1). Id., at 40.
The District Court disagreed. It recognized that “Vickie’s counterclaim for tortious interference falls within the literal language” of the statute designating certain proceedings as “core,” see § 157(b)(2)(C), but understood this Court’s precedent to “suggest[] that it would be unconstitutional to hold that any and all counterclaims are core.” 264 B. R. 609, 629-630 (CD Cal. 2001) (citing Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U. S. 50, 79, n. 31 (1982) (plurality opinion)). The District Court accordingly concluded that a “counterclaim should not be characterized as core” when it “is only somewhat related to the claim against which it is asserted, and when the unique characteristics and context of the counterclaim place it outside of the normal type of set-off or other counterclaims that customarily arise.” 264 B. R., at 632.
Because the District Court concluded that Vickie’s counterclaim was not core, the court determined that it was re *472 quired to treat the Bankruptcy Court’s judgment as “proposed^] rather than final,” and engage in an “independent review” of the record. Id., at 633; see 28 U. S. C. § 157(c)(1). Although the Texas state court had by that time conducted a jury trial on the merits of the parties’ dispute and entered a judgment in Pierce’s favor, the District Court declined to give that judgment preclusive effect and went on to decide the matter itself. 271 B. R. 858, 862-867 (CD Cal. 2001); see 275 B. R. 5, 56-58 (CD Cal. 2002). Like the Bankruptcy Court, the District Court found that Pierce had tortiously interfered with Vickie’s expectancy of a gift from J. Howard. The District Court awarded Vickie compensatory and punitive damages, each in the amount of $44,292,767.33. Id., at 58.
The Court of Appeals reversed the District Court on a different ground, 392 P. 3d, at 1137, and we — in the first visit of the case to this Court — reversed the Court of Appeals on that issue. 547 U. S., at 314-315. On remand from this Court, the Court of Appeals held that §157 mandated “a two-step approach” under which a bankruptcy judge may issue a final judgment in a proceeding only if the matter both “meets Congress’ definition of a core proceeding and arises under or arises in title 11,” the Bankruptcy Code. 600 F. 3d, at 1055. The court also reasoned that allowing a bankruptcy judge to enter final judgments on all counterclaims raised in bankruptcy proceedings “would certainly run afoul” of this Court’s decision in Northern Pipeline. 600 F. 3d, at 1057. With those concerns in mind, the court concluded that “a counterclaim under § 157(b)(2)(C) is properly a ‘core’ proceeding ‘arising in a case under’ the [Bankruptcy] Code only if the counterclaim is so closely related to [a creditor’s] proof of claim that the resolution of the counterclaim is necessary to resolve the allowance or disallowance of the claim itself.” Id., at 1058 (internal quotation marks omitted; second brackets added). The court ruled that Vickie’s counterclaim did not meet that test. Id., at 1059. That holding made “the *473 Texas probate court’s judgment . . . the earliest final judgment entered on matters relevant to this proceeding,” and therefore the Court of Appeals concluded that the District Court should have “afford[ed] preclusive effect” to the Texas “court’s determination of relevant legal and factual issues.” Id., at 1064-1065.[2]
We again granted certiorari. 561 U. S. 1058 (2010).
II
A
With certain exceptions not relevant here, the district courts of the United States have “original and exclusive jurisdiction of all cases under title 11.” 28 U. S. C. § 1334(a). Congress has divided bankruptcy proceedings into three categories: those that “aris[e] under title 11”; those that “aris[e] in” a Title 11 case; and those that are “related to a case under title 11.” § 157(a). District courts may refer any or all such proceedings to the bankruptcy judges of their district, ibid., which is how the Bankruptcy Court in this case came to preside over Vickie’s bankruptcy proceedings. District courts also may withdraw a case or proceeding referred to the bankruptcy court “for cause-shown.” § 157(d). Since Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 Act), bankruptcy judges for each district have been appointed to 14-year terms by the courts of appeals for the circuits in which their district is located. § 152(a)(1).
The manner in which a bankruptcy judge may act on a referred matter depends on the type of proceeding involved. *474 Bankruptcy judges may hear and enter final judgments in “all core proceedings arising under title 11, or arising in a case under title 11.” § 157(b)(1). “Core proceedings include, but are not limited to,” 16 different types of matters, including “counterclaims by [a debtor’s] estate against persons filing claims against the estate.” § 157(b)(2)(C).[3] Par *475 ties may appeal final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards. See § 158(a); Fed. Rule Bkrtcy. Proc. 8013.
When a bankruptcy judge determines that a referred “proceeding ... is not a core proceeding but... is otherwise related to a ease under title 11,” the judge may only “submit proposed findings of fact and conclusions of law to the district court.” § 157(c)(1). It is the district court that enters final judgment in such cases after reviewing de novo any matter to which a party objects. Ibid.
B
Vickie’s counterclaim against Pierce for tortious interference is a “core proceeding” under the plain text of § 157(b)(2)(C). That provision specifies that core proceedings include “counterclaims by the estate against persons filing claims against the estate.” In past cases, we have suggested that a proceeding’s “core” status alone authorizes a bankruptcy judge, as a statutory matter, to enter final judg-. ment in the proceeding. See, e. g., Granfinanciera, S. A. v. Nordberg, 492 U. S. 33, 50 (1989) (explaining that Congress had designated certain actions as “ 'core proceedings,’ which bankruptcy judges may adjudicate and in which they may issue final judgments, if a district court has referred the matter to them” (citations omitted)). We have not directly addressed the question, however, and Pierce argues that a bankruptcy judge may enter final judgment on a core proceeding only if that proceeding also “aris[es] in” a Title 11 case or “aris[es] under” Title 11 itself. Brief for Respondent 51 (internal quotation marks omitted).
Section 157(b)(1) authorizes bankruptcy courts to “hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11.” As written, § 157(b)(1) is ambiguous. The “arising under” and “arising in” phrases might, as Pierce suggests, be read as referring to a limited category of those core pro *476 ceedings that are. addressed in that section. On the other hand, the phrases might be read as simply describing what core proceedings are: matters arising under Title 11 or in a Title 11 ease. In this case the structure and context of § 157 contradict Pierce’s interpretation of § 157(b)(1).
As an initial matter, Pierce’s reading of the statute necessarily assumes that there is a category of core proceedings that neither arise under Title 11 nor arise in a Title 11 case. The manner in which the statute delineates the bankruptcy courts’ authority, however, makes plain that no such category exists. Section 157(b)(1) authorizes bankruptcy judges to enter final judgments in “core proceedings arising under title 11, or arising in a case under title 11.” Section 157(c)(1) instructs bankruptcy judges to instead submit proposed findings in “a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.” Nowhere does § 157 specify what bankruptcy courts are to do with respect to the category of matters that Pierce posits — core proceedings that do not arise under Title 11 or in a Title 11 case. To the contrary, § 157(b)(3) only instructs a bankruptcy judge to “determine, on the judge’s own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11.” Two options. The statute does not suggest that any other distinctions need be made.
Under our reading of the statute, core proceedings are those that arise in a bankruptcy case or under Title 11. The detailed list of core proceedings in § 157(b)(2) provides courts with ready examples of such matters. Pierce’s reading of § 157, in contrast, supposes that some core proceedings will arise in a Title 11 case or under Title 11 and some will not. Under that reading, the statute provides no guidance on how to tell which are which.
We think it significant that Congress failed to provide any framework for identifying or adjudicating the asserted category of core but not “arising” proceedings, given the other *477 wise detailed provisions governing bankruptcy court authority. It is hard to believe that Congress would go to the trouble of cataloging 16 different types of proceedings that should receive “core” treatment, but then fail to specify how to determine whether those matters arise under Title 11 or in a bankruptcy case if — as Pierce asserts — the latter inquiry is determinative of the bankruptcy court's authority.
Pierce argues that we should treat core matters that arise neither under Title 11 nor in a Title 11 case as proceedings “related to” a Title 11 case. Brief for Bespondent 60 (internal quotation marks omitted). We think that a contradiction in terms. It does not make sense to describe a “core” bankruptcy proceeding as merely “related to” the bankruptcy case; oxymoron is not a typical feature of congressional drafting. See Northern Pipeline, 458 U. S., at 71 (plurality opinion) (distinguishing “the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, . . . from the adjudication of state-created private rights”); 1 Collier on Bankruptcy ¶ 3.02[2], p. 3-26, n. 5 (16th ed. 2010) (“The terms 'non-core' and ‘related’ are synonymous”); see also id., at 3-26 (“The phraseology of section 157 leads to the conclusion that there is no such thing as a core matter that is ‘related to’ a case under title 11. Core proceedings are, at most, those that arise in title 11 cases or arise under title 11” (footnote omitted)). And, as already discussed, the statute simply does not provide for a proceeding that is simultaneously core and yet only related to the bankruptcy case. See § 157(c)(1) (providing only for “a proceeding that is not a core proceeding but that is otherwise related to a case under title 11”).
As we explain in Part III, we agree with Pierce that designating all counterclaims as “core” proceedings raises serious constitutional concerns. Pierce is also correct that we will, where possible, construe federal statutes so as “to avoid serious doubt of their constitutionality.” Commodity Futures Trading Comm’n v. Schor, 478 U. S. 833, 841 (1986) (internal *478 quotation marks omitted). But that “canon of construction does not give [us] the prerogative to ignore the legislative will in order to avoid constitutional adjudication.” Ibid. In this case, we do not think the plain text of § 157(b)(2)(C) leaves any room for the canon of avoidance. We would have to “rewrit[e]” the statute, not interpret it, to bypass the constitutional issue § 157(b)(2)(C) presents. Id., at 841 (internal quotation marks omitted). That we may not do. We agree with Vickie that § 157(b)(2)(C) permits the bankruptcy court to enter a final judgment on her tortious interference counterclaim.
C
Pierce argues, as another alternative to reaching the constitutional question, that the Bankruptcy Court lacked jurisdiction to enter final judgment on his defamation claim. Section 157(b)(5) provides that “[t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose.” Pierce asserts that his defamation claim is a “personal injury tort,” that the Bankruptcy Court therefore had no jurisdiction over that claim, and that the court therefore necessarily lacked jurisdiction over Vickie’s counterclaim as well. Brief for Respondent 65-66.
Vickie objects to Pierce’s statutory analysis across the board. To begin, Vickie contends that § 157(b)(5) does not address subject matter jurisdiction at all, but simply specifies the venue in which “personal injury tort and wrongful death claims” should be tried. See Reply Brief for Petitioner 16-17,19; see also Tr. of Oral Arg. 23 (Deputy Solicitor General) (Section “157(b)(5) is, in [the United States’] view, not jurisdictional”). Given the limited scope of that provision, Vickie argues, a party may waive or forfeit any objections under § 157(b)(5), in the same way that a party may waive or forfeit an objection to the bankruptcy court finally resolving a noncore claim. Reply Brief for Petitioner 17-20; *479 see § 157(c)(2) (authorizing the district court, “with the consent of all the parties to the proceeding,” to refer a “related to” matter to the bankruptcy court for final judgment). Vickie asserts that in this case Pierce consented to the Bankruptcy Court's adjudication of his defamation claim, and forfeited any argument to the contrary, by failing to seek withdrawal of the claim until he had litigated it before the Bankruptcy Court for 27 months. Id., at 20-23. On the merits, Vickie contends that the statutory phrase “personal injury tort and wrongful death claims” does not include nonphysical torts such as defamation. Id., at 25-26.
We need not determine what constitutes a “personal injury tort” in this case because we agree with Vickie that § 157(b)(5) is not jurisdictional, and that Pierce consented to the Bankruptcy Court's resolution of his defamation claim.[4] Because “[bjranding a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adver *480 sarial system,” Henderson v. Shinseki, 562 U. S. 428, 434 (2011), we are not inclined to interpret statutes as creating a jurisdictional bar when they are not framed as such. See generally Arbaugh v. Y & H Corp., 546 U. S. 500, 516 (2006) (“when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character”).
Section 157(b)(5) does not have the hallmarks of a jurisdictional decree. To begin, the statutory text does not refer to either district court or bankruptcy court “jurisdiction,” instead addressing only where personal injury tort claims “shall be tried.”
The statutory context also belies Pierce’s jurisdictional claim. Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. See §§ 157(b)(1), (c)(1). That allocation does not implicate questions of subject matter jurisdiction. See § 157(c)(2) (parties may consent to entry of final judgment by bankruptcy judge in noncore case). By the same token, § 157(b)(5) simply specifies where a particular category of cases should be tried. Pierce does not explain why that statutory limitation may not be similarly waived.
We agree with Vickie that Pierce not only could but did consent to the Bankruptcy Court’s resolution of his defamation claim. Before the Bankruptcy Court, Vickie objected to Pierce’s proof of claim for defamation, arguing that Pierce’s claim was unenforceable and that Pierce should not receive any amount for it. See 29 Court of Appeals Supplemental Excerpts of Record 6031, 6035 (hereinafter Supplemental Record). Vickie also noted that the Bankruptcy Court could defer ruling on her objection, given the litigation posture of Pierce’s claim before the Bankruptcy Court. See id., at 6031. Vickie’s filing prompted Pierce to advise the Bankruptcy Court that “[a]ll parties are in agreement that the amount of the contingent Proof of Claim filed by [Pierce] shall be determined by the adversary proceedings” that had *481 been commenced in the Bankruptcy Court. 31 id., at 6801. Pierce asserted that Vickie’s objection should be overruled or, alternatively, that any ruling on the objection “should be continued until the resolution of the pending adversary proceeding litigation.” Ibid. Pierce identifies no point in the record where he argued to the Bankruptcy Court that it lacked the authority to adjudicate his proof of claim because the claim sought recompense for a personal injury tort.
Indeed, Pierce apparently did not object to any court that § 157(b)(5) prohibited the Bankruptcy Court from resolving his defamation claim until over two years — and several adverse discovery rulings — after he filed that claim in June 1996. The first filing Pierce cites as raising that objection is his September 22, 1998 motion to the District Court to withdraw the reference of the case to the Bankruptcy Court. See Brief for Respondent 26-27. The District Court did initially withdraw the reference as requested, but it then returned the proceeding to the Bankruptcy Court, observing that Pierce “implicated the jurisdiction of that bankruptcy court. He chose to be a party to that litigation.” App. 129. Although Pierce had objected in July 1996 to the Bankruptcy Court’s exercise of jurisdiction over Vickie’s counterclaim, he advised the court at that time that he was “happy to litigate [his] claim” there. 29 Supplemental Record 6101. Counsel stated that even though Pierce thought it was “probably cheaper for th[e] estate if [Pierce’s claim] were sent back or joined back with the State Court litigation,” Pierce “did choose” the Bankruptcy Court forum and “would be more than pleased to do it [t]here.” Id., at 6101-6102; see also App. to Pet. for Cert. 266, n. 17 (District Court referring to these statements).
Given Pierce’s course of conduct before the Bankruptcy Court, we conclude that he consented to that court’s resolution of his defamation claim (and forfeited any argument to the contrary). We have recognized “the value of waiver and forfeiture rules” in “complex” cases, Exxon Shipping Co. v. *482 Baker, 554 U. S. 471, 487-488, n. 6 (2008), and this case is no exception. In such cases, as here, the consequences of “a litigant . . . ‘sandbagging’ the court — remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor,” Puckett v. United States, 556 U. S. 129, 134 (2009) (some internal quotation marks omitted) — can be particularly severe. If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation, then he should have said so — and said so promptly. See United States v. Olano, 507 U. S. 725, 731 (1993) (“‘No procedural principle is more familiar to this Court than that a constitutional right,’ or a right of any other sort, ‘may be forfeited ... by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it’ ” (quoting Yakus v. United States, 321 U. S. 414, 444 (1944))). Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there. We will not consider his claim to the contrary, now that he is sad.
III
Although we conclude that § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on Vickie’s counterclaim, Article III of the Constitution does not.
A
Article III, § 1, of the Constitution mandates that “[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.” The same section provides that the judges of those constitutional courts “shall hold their Offices during good Behaviour” and “receive for their Services[] a Compensation ] [that] shall not be diminished” during their tenure.
As its text and our precedent confirm, Article III is “an inseparable element of the constitutional system of checks *483 and balances” that “both defines the power and protects the independence of the Judicial Branch.” Northern Pipeline, 458 U. S., at 58 (plurality opinion). Under “the basic concept of separation of powers . . . that flow[s] from the scheme of a tripartite government” adopted in the Constitution, “the ‘judicial Power of the United States’ . . . can no more be shared” with another branch than “the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.” United States v. Nixon, 418 U. S. 683, 704 (1974) (quoting U. S. Const., Art. III, § 1).
In establishing the system of divided power in the Constitution, the Framers considered it essential that “the judiciary remain[] truly distinct from both the legislature and the executive.” The Federalist No. 78, p. 466 (C. Eossiter ed. 1961) (A. Hamilton). As Hamilton put it, quoting Montesquieu, “ ‘there is no liberty if the power of judging be not separated from the legislative and executive powers.’” Ibid, (quoting 1 Montesquieu, Spirit of Laws 181).
We have recognized that the three branches are not hermetically sealed from one another, see Nixon v. Administrator of General Services, 433 U. S. 425, 443 (1977), but it remains true that Article III imposes some basic limitations that the other branches may not transgress. Those limitations serve two related purposes. “Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution’s concern. The structural principles secured by the separation of powers protect the individual as well.” Bond v. United States, ante, at 222.
Article III protects liberty not only through its role in implementing the separation of powers, but also by specifying the defining characteristics of Article III judges. The colonists had been subjected to judicial abuses at the hand *484 of the Crown, and the Framers knew the main reasons why: because the King of Great Britain “made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.” The Declaration of Independence ¶ 11. The Framers undertook in Article III to protect citizens subject to the judicial power of the new Federal Government from a repeat of those abuses. By appointing judges to serve without term limits, and restricting the ability of the other branches to remove judges or diminish their salaries, the Framers sought to ensure that each judicial decision would be rendered, not with an eye toward currying favor with Congress or the Executive, but rather with the “[c]lear heads . . . and honest hearts” deemed “essential to good judges.” 1 Works of James Wilson 363 (J. Andrews ed. 1896).
Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's “judicial Power” on entities outside Article III. That is why we have long recognized that, in general, Congress may not “withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.” Murray’s Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 284 (1856). When a suit is made of “the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,” Northern Pipeline, 458 U. S., at 90 (Rehnquist, J., concurring in judgment), and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Constitution assigns that job — resolution of “the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law” — to the Judiciary. Id., at 86-87, n. 39 (plurality opinion).
*485 B
This is not the first time we have faced an Article III challenge to a bankruptcy court’s resolution of a debtor’s suit. In Northern Pipeline, we considered whether bankruptcy judges serving under the Bankruptcy Act of 1978 — appointed by the President and confirmed by the Senate, but lacking the tenure and salary guarantees of Article III— could “constitutionally be vested with jurisdiction to decide [a] state-law contract claim” against an entity that was not otherwise part of the bankruptcy proceedings. Id., at 53, 87, n. 40 (plurality opinion); see id., at 89-92 (Rehnquist, J., concurring in judgment). The Court concluded that assignment of such state law claims for resolution by those judges “violates Art. Ill of the Constitution.” Id., at 52, 87 (plurality opinion); id., at 91 (Rehnquist, J., concurring in judgment).
The plurality in Northern Pipeline recognized that there was a category of cases involving “public rights” that Congress could constitutionally assign to “legislative” courts for resolution. That opinion concluded that this “public rights” exception extended “only to matters arising between” individuals and the Government “in connection with the performance of the constitutional functions of the executive or legislative departments ... that historically could have been determined exclusively by those” branches. Id., at 67-68 (internal quotation marks omitted). A full majority of the Court, while not agreeing on the scope of the exception, concluded that the doctrine did not encompass adjudication of the state law claim at issue in that case. Id., at 69-72; see id., at 90-91 (Rehnquist, J., concurring in judgment) (“None of the [previous cases addressing Article III power] has gone so far as to sanction the type of adjudication to which Marathon will be subjected .... To whatever extent different powers granted under [the 1978] Act might be sustained under the 'public rights’ doctrine of Murray’s Lessee . . . *486 and succeeding cases, I am satisfied that the adjudication of Northern's lawsuit cannot be so sustained”).[5]
A full majority of Justices in Northern Pipeline also rejected the debtor's argument that the bankruptcy court’s exercise of jurisdiction was constitutional because the bankruptcy judge was acting merely as an adjunct of the district court or court of appeals. Id., at 71-72, 81-86 (plurality opinion); id., at 91 (Rehnquist, J., concurring in judgment) (“the bankruptcy court is not an ‘adjunct’ of either the district court or the court of appeals”).
After our decision in Northern Pipeline, Congress revised the statutes governing bankruptcy jurisdiction and bankruptcy judges. In the 1984 Act, Congress provided that the judges of the new bankruptcy courts would be appointed by the courts of appeals for the circuits in which their districts are located. 28 U. S. C. § 152(a). And, as we have explained, Congress permitted the newly constituted bankruptcy courts to enter final judgments only in “core” proceedings. See supra, at 473-475.
With respect to such “core” matters, however, the bankruptcy courts under the 1984 Act exercise the same powers they wielded under the Bankruptcy Act of 1978 (1978 Act), 92 Stat. 2549. As in Northern Pipeline, for example, the newly constituted bankruptcy courts are charged under § 157(b)(2)(C) with resolving “[a]ll matters of fact and law in whatever domains of the law to which” a counterclaim may lead. 458 U. S,, at 91 (Rehnquist, J., concurring in judgment); see, e. g., 275 B. R., at 50-51 (noting that Vickie’s counterclaim required the bankruptcy court to determine whether Texas recognized a cause of action for tortious interference with an inter vivos gift — something the Supreme Court of Texas had yet to do). As in Northern Pipeline, the new courts in core proceedings “issue final judgments, *487 which are binding and enforceable even in the absence of an appeal.” 458 U. S., at 85-86 (plurality opinion). And, as in Northern Pipeline, the district courts review the judgments of the bankruptcy courts in core proceedings only under the usual limited appellate standards. That requires marked deference to, among other things, the bankruptcy judges’ findings of fact. See § 158(a); Fed. Rule Bkrtcy. Proc. 8013 (findings of fact “shall not be set aside unless clearly erroneous”).
C
Vickie and the dissent argue that the Bankruptcy Court’s entry of final judgment on her state common law counterclaim was constitutional, despite the similarities between the bankruptcy courts under the 1978 Act and those exercising core jurisdiction under the 1984 Act. We disagree. It is clear that the Bankruptcy Court in this case exercised the “judicial Power of the United States” in purporting to resolve and enter final judgment on a state common law claim, just as the court did in Northern Pipeline. No “public right” exception excuses the failure to comply with Article III in doing so, any more than in Northern Pipeline. Vickie argues that this case is different because the defendant is a creditor in the bankruptcy. But the debtors’ claims in the cases on which she relies were themselves federal claims under bankruptcy law, which would be completely resolved in the bankruptcy process of allowing or disallowing claims. Here Vickie’s claim is a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor’s proof of claim in bankruptcy. Northern Pipeline and our subsequent decision in Granfinanciera, 492 U. S. 33, rejected the application of the “public rights” exception in such cases.
Nor can the bankruptcy courts under the 1984 Act be dismissed as mere adjuncts of Article III courts, any more than could the bankruptcy courts under the 1978 Act. The judicial powers the courts exercise in cases such as this remain *488 the same, and a court exercising such broad powers is no mere adjunct of anyone.
1
Vickie’s counterclaim cannot be deemed a matter of “public right” that can be decided outside the Judicial Branch. As explained above, in Northern Pipeline we rejected the argument that the public rights doctrine permitted a bankruptcy court to adjudicate a state law suit brought by a debtor against a company that had not filed a claim against the estate. See 458 U. S., at 69-72 (plurality opinion); id., at 90-91 (Rehnquist, J., concurring in judgment). Although our discussion of the public rights exception since that time has not been entirely consistent, and the exception has been the subject of some debate, this case does not fall within any of the various formulations of the concept that appear in this Court’s opinions.
We first recognized the category of public rights in Murray’s Lessee v. Hoboken Land & Improvement Co., 18 How. 272 (1856). That case involved the Treasury Department’s sale of property belonging to a customs collector who had failed to transfer payments to the Federal Government that he had collected on its behalf. Id., at 274, 275. The plaintiff, who claimed title to the same land through a different transfer, objected that the Treasury Department’s calculation of the deficiency and sale of the property was void, because it was a judicial act that could not be assigned to the Executive under Article III. Id., at 274-275, 282-283.
“To avoid misconstruction upon so grave a subject,” the Court laid out the principles guiding its analysis. Id., at 284. It confirmed that Congress cannot “withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.” Ibid. The Court also recognized that “[a]t the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determi *489 nation, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.” Ibid.
As an example of such matters, the Court referred to “Equitable claims to land by the inhabitants of ceded territories” and cited cases in which land issues were conclusively resolved by Executive Branch officials. Ibid, (citing Foley v. Harrison, 15 How. 433 (1854); Burgess v. Gray, 16 How. 48 (1854)). In those cases “it depends upon the will of congress whether a remedy in the courts shall be allowed at all,” so Congress could limit the extent to which a judicial forum was available. Murray’s Lessee, 18 How., at 284. The challenge in Murray’s Lessee to the Treasury Department’s sale of the collector’s land likewise fell within the “public rights” category of cases, because it could only be brought if the Federal Government chose to allow it by waiving sovereign immunity. Id., at 283-284. The point of Murray’s Lessee was simply that Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all.
Subsequent decisions from this Court contrasted cases within the reach of the public rights exception — those arising “between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments” — and those that were instead matters “of private right, that is, of the liability of one individual to another under the law as defined.” Crowell v. Benson, 285 U. S. 22, 50, 51 (1932).[6] See Atlas Roofing Co. v. Occupational Safety *490 and Health Review Comm’n, 430 U. S. 442, 458 (1977) (exception extends to cases “where the Government is involved in its sovereign capacity under ... [a] statute creating enforceable public rights,” while “[w]holly private tort, contract, and property cases, as well as a vast range of other cases ... are not at all implicated”); Ex parte Bakelite Corp., 279 U. S. 438, 451-452 (1929). See also Northern Pipeline, 458 U. S., at 68 (plurality opinion) (citing Ex parte Bakelite Corp. for the proposition that the doctrine extended “only to matters that historically could have been determined exclusively by” the Executive and Legislative Branches).
Shortly after Northern Pipeline, the Court rejected the limitation of the public rights exception to actions involving the Government as a party. The Court has continued, however, to limit the exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency’s authority. In other words, it is still the case that what makes a right “public” rather than private is that the right is integrally related to particular Federal Government *491 action. See United States v. Jicarilla Apache Nation, ante, at 174 (“The distinction between ‘public rights’ against the Government and ‘private rights’ between private parties is well established” (citing Murray’s Lessee and Crowell)).
Our decision in Thomas v. Union Carbide Agricultural Products Co., for example, involved a data-sharing arrangement between companies under a federal statute providing that disputes about compensation between the companies would be decided by binding arbitration. 473 U. S. 568,571-575 (1985). This Court held that the scheme did not violate Article III, explaining that “[a]ny right to compensation . . . results from [the statute] and does not depend on or replace a right to such compensation under state law.” Id., at 584.
Commodity Futures Trading Comm’n v. Schor concerned a statutory scheme that created a procedure for customers injured by a broker’s violation of the federal commodities law to seek reparations from the broker before the Commodity Futures Trading Commission (CFTC). 478 U. S., at 836. A customer filed such a claim to recover a debit balance in his account, while the broker filed a lawsuit in Federal District Court to recover the same amount as lawfully due from the customer. The broker later submitted its claim to the CFTC, but after that agency ruled against the customer, the customer argued that agency jurisdiction over the broker’s counterclaim violated Article III. Id., at 837-838. This Court disagreed, but only after observing that (1) the claim and the counterclaim concerned a “single dispute” — the same account balance; (2) the CFTC’s assertion of authority involved only “a narrow class of common law claims” in a “ ‘particularized area of law”’; (3) the area of law in question was governed by “a specific and limited federal regulatory scheme” as to which the agency had “obvious expertise”; (4) the parties had freely elected to resolve their differences before the CFTC; and (5) CFTC orders were “enforceable only by order of the district court.” Id., at 844, 852-856 (quoting Northern Pipeline, supra, at 85); see 478 U. S., at *492 843-844, 849-857. Most significantly, given that the customer’s reparations claim before the agency and the broker’s counterclaim were competing claims to the same amount, the Court repeatedly emphasized that it was “necessary” to allow the agency to exercise jurisdiction over the broker’s claim, or else “the reparations procedure would have been confounded.” Id., at 856.
The most recent case in which we considered application of the public rights exception — and the only case in which we have considered that doctrine in the bankruptcy context 3incc Northern Pipeline—is Granfinanciera, S. A. v. Nordberg, 492 U. S. 33 (1989). In Granfinanciera we rejected a bankruptcy trustee’s argument that a fraudulent conveyance action filed on behalf of a bankruptcy estate against a non-creditor in a bankruptcy proceeding fell within the “public rights” exception. We explained that, “[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court.” Id., at 54-55. We reasoned that fraudulent conveyance suits were “quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than, they do creditors’ hierarchically ordered claims to a pro rata share of the bankruptcy res.” Id., at 56. As a consequence, we concluded that fraudulent conveyance actions were “more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions.” Id., at 55.[7]
*493 Vickie's counterclaim — like the fraudulent conveyance claim at issue in Granfinanciera — does not fall within any of the varied formulations of the public rights exception in this Court’s cases. It is not a matter that can be pursued only by grace of the other branches, as in Murray’s Lessee, 18 How., at 284, or one that “historically could have been determined exclusively by” those branches, Northern Pipeline, 458 U. S., at 68 (citing Ex parte Bakelite Corp., 279 U. S., at 458). The claim is instead one under state common law between two private parties. It does not “depend[] upon the will of congress,” Murray’s Lessee, supra, at 284; Congress has nothing to do with it.
In addition, Vickie’s claimed right to relief does not flow from a federal statutory scheme, as in Thomas, supra, at 584-585, or Atlas Roofing, 430 U. S., at 458. It is not “completely dependent upon” adjudication of a claim created by federal law, as in Schor, 478 U. S., at 856. And in contrast to the objecting party in Schor, id., at 855-856, Pierce did not truly consent to resolution of Vickie’s claim in the bankruptcy court proceedings. He had nowhere else to go if he wished to recover from Vickie’s estate. See Granfinan-ciera, supra, at 59, n. 14 (noting that “[pjarallel reasoning [to Schor] is unavailable in the context of bankruptcy proceedings, because creditors lack an alternative forum to the bankruptcy court in which to pursue their claims”).[8]
Furthermore, the asserted authority to decide Vickie’s claim is not limited to a “particularized area of the law,” as in Crowell, Thomas, and Schor. Northern Pipeline, 458 U. S., at 85 (plurality opinion). We deal here not with an *494 agency but with a court, with substantive jurisdiction reaching any area of the corpus juris. See ibid.; id., at 91 (Rehnquist, J., concurring in judgment). This is not a situation in which Congress devised an “expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by an administrative agency specially assigned to that task.” Crowell, 285 U. S., at 46; see Schor, supra, at 855-856. The “experts” in the federal system at resolving common law counterclaims such as Vickie’s are the Article III courts, and it is with those courts that her claim must stay.
The dissent reads our cases differently, and in particular contends that more recent cases view Northern Pipeline as “ ‘establishing] only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.’” Post, at 510 (quoting Thomas, 473 U. S., at 584). Just so: Substitute “tort” for “contract,” and that statement directly covers this case.
We recognize that there may be instances in which the distinction between public and private rights — at least as framed by some of our recent cases — fails to provide concrete guidance as to whether, for example, a particular agency can adjudicate legal issues under a substantive regulatory scheme. Given the extent to which this case is so markedly distinct from the agency cases discussing the public rights exception in the context of such a regime, however, we do not in this opinion express any view on how the doctrine might apply in that different context.
What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a, court with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory re *495 gime. If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous “public right,” then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking.
2
Vickie and the dissent next attempt to distinguish Northern Pipeline and Granfinanciera on the ground that Pierce, unlike the defendants in those cases, had filed a proof of claim in the bankruptcy proceedings. Given Pierce’s participation in those proceedings, Vickie argues, the Bankruptcy Court had the authority to adjudicate her counterclaim under our decisions in Katchen v. handy, 382 U. S. 323 (1966), and Langenkamp v. Culp, 498 U. S. 42 (1990) (per curiam).
We do not agree. As an initial matter, it is hard to see why Pierce’s decision to file a claim should make any difference with respect to the characterization of Vickie’s counterclaim. “‘[Pjroperty interests are created and defined by state law,’ and ‘[ujnless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.” Travelers Casualty & Surety Co. of America v. Pacific Gas & Elec. Co., 549 U. S. 443, 451 (2007) (quoting Butner v. United States, 440 U. S. 48, 55 (1979)). Pierce’s claim for defamation in no way affects the nature of Vickie’s counterclaim for tortious interference as one at common law that simply attempts to augment the bankruptcy estate — the very type of claim that we held in Northern Pipeline and Granfinanciera must be decided by an Article III court.
Contrary to Vickie’s contention, moreover, our decisions in Katchen and Langenkamp do not suggest a different result. Katchen permitted a bankruptcy referee acting under the Bankruptcy Acts of 1898 and 1938 (akin to a bankruptcy court today) to exercise what was known as “summary juris *496 diction” over a voidable preference claim brought by the bankruptcy trustee against a creditor who had filed a proof of claim in the bankruptcy proceeding. See 382 U. S., at 325, 327-328. A voidable preference claim asserts that a debtor made a payment to a particular creditor in anticipation of bankruptcy, to in effect increase that creditor’s proportionate share of the estate. The preferred creditor’s claim in bankruptcy can be disallowed as a result of the preference, and the amounts paid to that creditor can be recovered by the trustee. See id., at 330; see also 11 U. S. C. §§ 502(d), 547(b).
Although the creditor in Katchen objected that the preference issue should be resolved through a “plenary suit” in an Article III court, this Court concluded that summary adjudication in bankruptcy was appropriate, because it was not possible for the referee to rule on the creditor’s proof of claim without first resolving the voidable preference issue. 382 U. S., at 329-330, 332-333, and n. 9, 334. There was no question that the bankruptcy referee could decide whether there had been a voidable preference in determining whether and to what extent to allow the creditor’s claim. Once the referee did that, “nothing remains for adjudication in a plenary suit”; such a suit “would be a meaningless gesture.” Id., at 334. The plenary proceeding the creditor sought could be brought into the bankruptcy court because “the same issue [arose] as part of the process of allowance and disallowance of claims.” Id., at 336.
It was in that sense that the Court stated that “he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure.” Id., at 333, n. 9. In Katchen, one of those consequences was resolution of the preference issue as part of the process of allowing or disallowing claims, and accordingly there was no basis for the creditor to insist that the issue be resolved in an Article III court. See id., at 334. Indeed, the Katchen Court expressly noted that it “intimate[d] no opinion concerning whether” the bankruptcy *497 referee would have had “summary jurisdiction to adjudicate a demand by the [bankruptcy] trustee for affirmative relief, all of the substantial factual and legal bases for which ha[d] not been disposed of in passing on objections to the [creditor’s proof of] claim.” Id., at 333, n. 9.
Our per curiam opinion in Langenkamp is to the same effect. We explained there that a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because then “the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.” 498 U. S., at 44. If, in contrast, the creditor has not filed a proof of claim, the trustee’s preference action does not “become[] part of the claims-allowance process” subject to resolution by the bankruptcy court. Ibid.; see id., at 45.
In ruling on Vickie’s counterclaim, the Bankruptcy Court was required to and did make several factual and legal determinations that were not “disposed of in passing on objections” to Pierce’s proof of claim for defamation, which the court had denied almost a year earlier. Katchen, supra, at 332, n. 9. There was some overlap between Vickie’s counterclaim and Pierce’s defamation claim that led the courts below to conclude that the counterclaim was compulsory, 600 F. 3d, at 1057, or at least in an “attenuated” sense related to Pierce’s claim, 264 B. R., at 631. But there was never any reason to believe that the process of adjudicating Pierce’s proof of claim would necessarily resolve Vickie’s counterclaim. See id., at 631, 632 (explaining that “the primary facts at issue on Pierce’s claim were the relationship between Vickie and her attorneys and her knowledge or approval of their statements,” and “the counterclaim raises issues of law entirely different from those raise[d] on the defamation claim”). The United States acknowledges the point. See Brief for United States as Amicus Curiae, p. (I) (question presented concerns authority of a bankruptcy court to enter final judgment on a compulsory counterclaim “when adjudi *498 cation of the counterclaim requires resolution of issues that are not implicated by the claim against the estate”); id., at 26.
The only overlap between the two claims in this ease was the question whether Pierce had in fact tortiously taken control of his father’s estate in the manner alleged by Vickie in her counterclaim and described in the allegedly defamatory statements. Prom the outset, it was clear that, even assuming the Bankruptcy Court would (as it did) rule in Vickie's favor on that question, the court could not enter judgment for Vickie unless the court additionally ruled on the questions whether Texas recognized tortious interference with an expected gift as a valid cause of action, what the elements of that action were, and whether those elements were met in this case. 275 B. R., at 50-53. Assuming Texas accepted the elements adopted by other jurisdictions, that meant Vickie would need to prove, above and beyond Pierce’s tor-tious interference, (1) the existence of an expectancy of a gift; (2) a reasonable certainty that the expectancy would have been realized but for the interference; and (3) damages. Id., at 51; see 253 B. R., at 558-561. Also, because Vickie sought punitive damages in connection with her counterclaim, the Bankruptcy Court could not finally dispose of the ease in Vickie's favor without determining whether to subject Pierce to the sort of “retribution,” “punishment[,] and deterrence,” Exxon Shipping Co., 554 U. S., at 492, 504 (internal quotation marks omitted), those damages are designed to impose. There thus was never reason to believe that the process of ruling on Pierce’s proof of claim would necessarily result in the resolution of Vickie’s counterclaim.
In both Katchen and Langenkamp, moreover, the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law. In Langen-kamp, we noted that “the trustee instituted adversary proceedings under 11 U. S. C. § 547(b) to recover, as avoidable preferences,” payments respondents received from the debtor before the bankruptcy filings. 498 U. S., at 43; see, *499 e. g., § 547(b)(1) (“the trustee may avoid any transfer of an interest of the debtor in property — (1) to or for the benefit of a creditor”). In Katchen, “[t]he Trustee . . . [asserted] that the payments made [to the creditor] were preferences inhibited by Section 60a of the Bankruptcy Act.” Memorandum Opinion (Feb. 8, 1963), Tr. of Record in O. T. 1965, No. 28, p. 3; see 382 U. S., at 334 (considering impact of the claims allowance process on “action by the trustee under § 60 to recover the preference”); 11 U. S. C. § 96(b) (1964 ed.) (§ 60(b) of the then-applicable Bankruptcy Act) (“preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby... has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent”). Vickie’s claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.
In fight of all the foregoing, we disagree with the dissent that there are no “relevant distinction^]” between Pierce’s claim in this case and the claim at issue in Langenkamp. Post, at 517. We see no reason to treat Vickie’s counterclaim any differently from the fraudulent conveyance action in Granfinanciera. 492 U. S., at 56. Gran financiera^ distinction between actions that seek “to augment the bankruptcy estate” and those that seek “a pro rata share of the bankruptcy res,” ibid., reaffirms that Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process. Vickie has failed to demonstrate that her counterclaim falls within one of the “limited circumstances” covered by the public rights exception, particularly given our conclusion that, “even with respect to matters that arguably fall within the scope of the ‘public rights’ doctrine, the presumption is in favor of Art. Ill courts.” Northern Pipeline, 458 U. S., at 69, n. 23, 77, n. 29 (plurality opinion).
*500 3
Vickie additionally argues that the Bankruptcy Court’s final judgment was constitutional because bankruptcy courts under the 1984 Act are properly deemed “adjuncts” of the district courts. Brief for Petitioner 61-64. We rejected a similar argument in Northern Pipeline, see 468 U. S., at 84-86 (plurality opinion); id., at 91 (Rehnquist, J., concurring in judgment), and our reasoning there holds true today.
To begin, as explained above, it is still the bankruptcy court itself that exercises the essential attributes of judicial power over a matter such as Vickie’s counterclaim. See supra, at 487-488. The new bankruptcy courts, like the old, do not “ma[k]e only specialized, narrowly confined factual determinations regarding a particularized area of law” or engage in “statutorily channeled factfinding functions.” Northern Pipeline, 458 U. S., at 85 (plurality opinion). Instead, bankruptcy courts under the 1984 Act resolve “[a]ll matters of fact and law in whatever domains of the law to which” the parties’ counterclaims might lead. Id., at 91 (Rehnquist, J., concurring in judgment).
In addition, whereas the adjunct agency in Crowell v. Benson “possessed only a limited power to issue compensation orders . . . [that] could be enforced only by order of the district court,” Northern Pipeline, supra, at 85, a bankruptcy court resolving a counterclaim under 28 U. S. C. § 157(b) (2)(C) has the power to enter “appropriate orders and judgments” — including final judgments — subject to review only if a party chooses to appeal, see §§ 157(b)(1), 158(a)-(b). It is thus no less the case here than it was in Northern Pipeline that “[t]he authority — and the responsibility — to make an informed, final determination . . . remains with” the bankruptcy judge, not the district court. 458 U. S., at 81 (plurality opinion) (internal quotation marks omitted). Given that authority, a bankruptcy court can no more be deemed a mere “adjunct” of the district court than a district court can be deemed such an “adjunct” of the court of appeals. We cer *501 tainly cannot accept the dissent’s notion that judges who have the power to enter final, binding orders are the “functional[]” equivalent of “law elerks[] and the Judiciary’s administrative officials.” Post, at 515. And even were we wrong in this regard, that would only confirm that such judges should not be in the business of entering final judgments in the first place.
It does not affect our analysis that, as Vickie notes, bankruptcy judges under the current Act are appointed by the Article III courts, rather than the President. See Brief for Petitioner 59. If — as we have concluded — the bankruptcy court itself exercises “the essential attributes of judicial power [that] are reserved to Article III courts,” Sckor, 478 TT. S., at 851 (internal quotation marks omitted), it does not matter who appointed the bankruptcy judge or authorized the judge to render final judgments in such proceedings. The constitutional bar remains. See The Federalist No. 78, at 471 (“Periodical appointments, however regulated, or by whomsoever made, would, in some way or other, be fatal to [a judge’s] necessary independence”).
D
Finally, Vickie and her amici predict as a practical matter that restrictions on a bankruptcy court’s ability to hear and finally resolve compulsory counterclaims will create significant delays and impose additional costs on the bankruptcy process. See, e. g., Brief for Petitioner 34-36, 57-58; Brief for United States as Amicus Curiae 29-30. It goes without saying that “the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, -mil not save it if it is contrary to the Constitution.” INS v. Chadha, 462 U. S. 919, 944 (1983).
In addition, we are not convinced that the practical consequences of such limitations on the authority of bankruptcy courts to enter final judgments are as significant as Vickie and the dissent suggest. See post, at 519-520. The dissent *502 asserts that it is important that counterclaims such as Vick-' ie’s be resolved “in a bankruptcy court,” and that, “to be effective, a single tribunal must have broad authority to restructure [debtor-creditor] relations.” Post, at 518, 519 (emphasis deleted). Rut the framework Congress adopted in the 1984 Act already contemplates that certain state law matters in bankruptcy cases will be resolved by judges other than those of the bankruptcy courts. Section 1334(c)(2), for example, requires that bankruptcy courts abstain from hearing specified noncore, state law claims that “can be timely adjudicated[] in a State forum of appropriate jurisdiction.” Section 1334(c)(1) similarly provides that bankruptcy courts may abstain from hearing any proceeding, including core matters, “in the interest of comity with State courts or respect for State law.”
As described above, the current bankruptcy system also requires the district court to review de novo and enter final judgment on any matters that are “related to” the bankruptcy proceedings, § 157(c)(1), and permits the district court to withdraw from the bankruptcy court any referred ease, proceeding, or part thereof, § 157(d). Pierce has not argued that the bankruptcy courts “are barred from 'hearing’ all counterclaims” or proposing findings of fact and conclusions of law on those matters, but rather that it must be the district court that “finally decide[s]” them. Brief for Respondent 61. We do not think the removal of counterclaims such as Vickie’s from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a “narrow” one. Brief for United States as Amicus Curiae 23.
If our decision today does not change all that much, then why the fuss? Is there really a threat to the separation of powers where Congress has conferred the judicial power outside Article III only over certain counterclaims in bankruptcy? The short but emphatic answer is yes. A statute *503 may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely. “Slight encroachments create new boundaries from which legions of power can seek new territory to capture.” Reid v. Covert, 354 U. S. 1, 39 (1957) (plurality opinion). Although “[i]t may be that it is the obnoxious thing in its mildest and least repulsive form,” we cannot overlook the intrusion: “illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.” Boyd v. United States, 116 U. S. 616, 635 (1886). We cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system, even with respect to challenges that may seem innocuous at first blush.
* * *
Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor’s proof of claim. Accordingly, the judgment of the Court of Appeals is affirmed.

It is so ordered.

 Because both Vickie and Pierce passed away during this litigation, the parties in this case are Vickie’s estate and Pierce’s estate. We continue to refer to them as “Vickie” and “Pierce.”

 One judge wrote a separate concurring opinion. He concluded that “Vickie’s counterclaim . . . [wa]s not a core proceeding, so the Texas probate court judgment preceded the district court judgment and controls.” 600 F. 3d, at 1065 (Kleinfeld, J.). The concurring judge also “offerfed] additional grounds” that he believed required judgment in Pierce’s favor. Ibid. Pierce presses only one of those additional grounds here; it is discussed below, in Part II-C.

 In full, §§ 157(b)(l)-(2) provides:
“(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a ease under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
“(2) Core proceedings include, but are not limited to—
“(A) matters concerning the administration of the estate;
“(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
“(C) counterclaims by the estate against persons filing claims against the estate;
“(D) orders in respect to obtaining credit;
“(E) orders to turn over property of the estate;
“(F) proceedings to determine,'avoid, or recover preferences;
“(G) motions to terminate, annul, or modify the automatic stay;
“(H) proceedings to determine, avoid, or recover fraudulent conveyances;
“(I) determinations as to the dischargeability of particular debts;
“(J) objections to discharges;
“(K) determinations of the validity, extent, or priority of liens;
“(L) confirmations of plans;
“(M) orders approving the use or lease of property, including the use of cash collateral;
“(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;
“(0) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and
“(P) recognition of foreign proceedings and other matters under chapter 15 of title 11.”

 Although Pierce suggests that consideration of “the 157(b)(5) issue” would facilitate an “easy” resolution of the case, Tr. of Oral Arg. 47-48, he is mistaken. Had Pierce preserved his argument under that provision, we would have been confronted with several questions on which there is little consensus or precedent. Those issues include: (1) the scope of the phrase “personal injury tort” — a question over which there is at least a three-way divide, see In re Arnold, 407 B. R. 849, 851-853 (Bkrtcy. Ct. MDNC 2009); (2) whether, as Vickie argued in the Court of Appeals, the requirement that a personal injury tort claim be “tried” in the district court nonetheless permits the bankruptcy court to resolve the claim short of trial, see Appellee’s/Cross-Appellant’s Supplemental Brief in No. 02-56002 etc. (CA9), p. 24; see also In re Dow Corning Corp., 215 B. R. 346, 349-351 (Bkrtcy. Ct. ED Mich. 1997) (noting divide over whether, and on what grounds, a bankruptcy court may resolve a claim pretrial); and (3) even if Pierce’s defamation claim could be considered only by the District Court, whether the Bankruptcy Court might retain jurisdiction over the counterclaim, cf. Arbaugh v. Y & H Corp., 546 U. S. 500, 514 (2006) (“when a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U. S. C. § 1367, over pendent state-law claims”). We express no opinion on any of these issues and simply note that the § 157(b)(5) question is not as straightforward as Pierce would have it.

 The dissent is thus wrong in suggesting that less than a full Court agreed on the points pertinent to this case. Post, at 506 (opinion of Breyer, J.).

 Although the Court in Crowell went on to decide that the facts of the private dispute before it could be determined by a non-Article III tribunal in the first instance, subject to judicial review, the Court did so only after observing that the administrative adjudicator had only limited authority to make specialized, narrowly confined factual determinations regarding a particularized area of law and to issue orders that could be enforced only by action of the District Court. 285 U. S., at 38, 44-45, 54; see Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U. S. 50, 78 (1982) (plurality opinion). In other words, the agency in Crowell functioned as *490 a true “adjunct” of the District Court. That is not the ease here. See infra, at 500-501.
Although the dissent suggests that we understate the import of Crowell in this regard, the dissent itself recognizes — repeatedly—that Crowell by its terms addresses the determination of facts outside Article III. See post, at 508 (Crowell “upheld Congress’ delegation of primary factfinding authority to the agency”); post, at 515 (quoting Crowell, 285 U. S., at 51, for the proposition that “'there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges’ ”). Crowell may well have additional significance in the context of expert administrative agencies that oversee particular substantive federal regimes, but we have no occasion to and do not address those issues today. See infra, at 493-494. The United States apparently agrees that any broader significance of Cro-well is not pertinent in this case, citing to Crowell in its brief only once, in the last footnote, again for the limited proposition discussed above. Brief for United States as Amicus Curiae 32, n. 5.

 We noted that we did not mean to “suggest that the restructuring of debtor-creditor relations is in fact a public right.” 492 U. S., at 56, n. 11. Our conclusion was that, “even if one accepts this thesis,” Congress could not constitutionally assign resolution of the fraudulent conveyance action to a non-Article III court. Ibid. Because neither party asks us to reconsider the public righto framework for bankruptcy, we follow the same approach here.

 Contrary to the elaimo of the diaoent, see post, at 516, Pierce did not havo another forum in which to pursue his claim to recover from Vielrio’o prebankruptcy aseóte, rather than take his chances with whatever fundo might remain after the Title 11 proceedings. Creditors who possess elaimo that do not satisfy the requirements for n ondio charge ability under Í1 U. S. C. § 623 havo no choieo but to file their elaimo in bankruptcy pro ceedings if they want to pursue the claims at all. That is why, as we rocognicod in Granfinanciora, the notion of “consent” does not apply in bankruptcy proceedings as it might in other contexts.